Filed 10/23/13  In re Ismael G. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re ISMAEL G., A Person Coming Under the Juvenile Court Law. | B247456 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>Y. G.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK74453) |

APPEAL from an order of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Respondent.

Y. G. (mother) appeals from the dependency court's order terminating her parental rights with respect to her eight-year-old son, Ismael G. (Ismael). She contends that the court erred in concluding that the "beneficial parent-child relationship exception" to the termination of parental rights did not apply. Substantial evidence supports the court's determination. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     2007-2008

When this case began in 2007, mother was a juvenile court dependent due to maternal grandfather's physical and sexual abuse of her and her siblings, and maternal grandmother's refusal to address the abuse.[1] In February 2007, mother sent Ismael, who was almost two years old, to reside with maternal grandparents despite the sustained allegations of abuse against them in mother's dependency case.[2] On March 9, 2007, a petition was filed alleging that Ismael was at risk of physical, emotional and sexual abuse by maternal grandparents.[3] On March 12, 2007, mother left from her foster care placement and the Department lost contact with her.

The Department was unable to immediately remove Ismael from maternal grandparents' home because they apparently hid him. However, in June 2008, Ismael was removed and placed in foster care. Mother sought custody of Ismael. In July 2008,

---

[1]     Mother was fourteen years old when she became pregnant with Ismael.

[2]     Ismael was born on March 4, 2005.

[3]     The petition was filed in San Bernardino County, and the case was later transferred to Los Angeles County.

the court declared Ismael a dependent of the court, and ordered reunification services for mother.[4] [5]  The court also ordered that there be no contact between Ismael and maternal grandparents and aunts.

In September 2008, Ismael was placed with paternal grandmother.  The Department reported that mother was consistently late to her weekly visits and had missed several visits.  In November 2008, the Department reported that mother had visited Ismael accompanied by maternal grandfather and aunts, and that mother had not demonstrated any progress with court-ordered programs.  The Department recommended that family reunification services be terminated.  In December 2008, the Department reported that Ismael said mother continued to bring maternal relatives to visits.

B.     2009

In early 2009, the Department recommended that Ismael be returned to mother because she had complied with court orders and was receiving financial and emotional support from maternal grandfather and aunts.[6]  The court ordered that Ismael be returned to mother for a 30-day visit but ordered mother not to leave Ismael in the care of any maternal relatives.  In March 2009, the Department reported that mother

---

[4]     Father did not reunify with Ismael and does not appeal.

[5]     The court ordered mother to participate in a "reunification plan," but the record does not show what programs mother was ordered to participate in.

[6]     It is unclear why the Department appears to support mother's contact with maternal relatives here, while elsewhere the Department instructed mother to distance herself from them.

continued to "be close and dependent on" maternal grandfather and recommended terminating mother's reunification services. The court terminated mother's reunification services, and set a Welfare & Institutions Code[7] section 366.26 hearing.[8] Ismael was placed in the home of a prospective adoptive parent.

In September 2009, the Department reported that Ismael was content and well-behaved in the home of his caregiver. The Department also stated that mother was complying with her therapy and that mother and child were bonded. The court vacated the section 366.26 hearing, reinstated reunification services, ordered mother to attend parenting classes and individual counseling, and ordered unmonitored visits for mother.

In November 2009, the Department reported that after Ismael's first unmonitored visit with mother, he said he had visited with maternal relatives, had bit mother, and that mother had taken him to a tattoo parlor where he watched her get a tattoo. Ismael also said that he liked spending time with mother and asked if he could stay with her, but at other times said that he did not love her. On a subsequent visit, mother returned Ismael early because he had thrown a tantrum, biting and kicking her, and had run away from her. In December 2009, foster mother stated that mother constantly arrived late for visits, and that since unmonitored visits began, Ismael's behavior had declined: he was acting up at home and had gotten into fights with other children at school.

---

[7]     Unless otherwise stated, all statutory references are to the Welfare and Institutions Code.

[8]     Section 366.26 governs the termination of parental rights of children adjudged dependents of the court.

4

C. 2010

In January 2010, the Department reported that Ismael said he continued to see maternal relatives, including maternal grandfather, and that mother had abused Ismael by "inject[ing] the child with a syringe." The court changed mother's visits to monitored. In February 2010, the Department reported that mother often arrived late to visits. Foster mother said she did not "want any problems with mother" and was no longer interested in adopting Ismael. Ismael was placed in another home where the foster parents expressed an interest in adopting him.

In May 2010, the Department reported that mother had stopped attending her individual counseling sessions. In June 2010, the court terminated mother's reunification services and set a section 366.26 hearing. In October 2010, the Department reported that Ismael's present caregiver was not willing to adopt him due to her pending divorce, and that he said he wanted to live with mother. The section 366.26 hearing was continued.

D. 2011

In April 2011, the Department reported that Ismael had a good relationship with his caregiver but continued to express a desire to live with mother. In July 2011, the Department reported that mother consistently visited every Saturday for four hours, and that Ismael enjoyed those visits. However, in October 2011, the Department reported that mother had started canceling her visits and only visited Ismael once every 3-4 weeks. Mother did not visit Ismael at all during the month of October. The court

5

repeatedly continued the section 366.26 hearing as the Department searched for an adoptive family.

On December 28, 2011, Ismael was placed in his prospective adoptive home. On December 30, 2011, mother visited with Ismael at a restaurant. Mother gave Ismael clothes and the video game Call of Duty,[9] brought a four-year-old girl to the visit and told Ismael she was his sister, and said she was pregnant with another child. Ismael's prospective adoptive parents said he was "overwhelmed and upset" after the visit.

E.     2012

In January 2012, the Department reported that mother was agitated and verbally aggressive towards Ismael during recent visits, and stated that frequent visits would "undermine his security and developing stability in his prospective adoptive home." The Department reported that Ismael was making good progress in his prospective adoptive family's home and was benefiting from their "nurturing, structured and loving approach." The court granted the Department's request to reduce mother's visitation to every other week for two hours at the Department's office.

In April 2012, the Department reported that his prospective adoptive parents had made exhaustive efforts to reassure Ismael of their commitment to him and that Ismael said that he liked living with them. In June 2012, the Department reported that Ismael was thriving in the care of his prospective adoptive parents. The Department also reported that he eagerly anticipated contact with his mother and enjoyed a bond with

---

[9]     Call of Duty is a video game that simulates warfare.

her, but that the relationship seemed similar to one between a brother and his elder sister.

The court ordered a "bonding study" with mother, prospective adoptive parents, and Ismael. The psychiatrist who administered the study reported that Ismael said that he wanted to live with his mother, but also said that he liked his prospective adoptive parents. The psychiatrist found that Ismael had ambivalent and confused feelings about mother due to her lack of commitment to him, and that he needed consistency and permanence. The psychiatrist concluded that Ismael's emotional attachment to mother did not outweigh the benefits of adoption.

The two psychiatrists who provided therapy to Ismael and his prospective adoptive parents also opined that it was "extremely important to establish a permanent family arrangement for Ismael as soon as possible." In October 2012, the Department reported that Ismael was settling into his new environment and that his attachment to his prospective adoptive parents was strengthening. The prospective adoptive parents reported that they were prepared to continue some contact with mother, and the Department recommended a post-adoption agreement so that Ismael could continue to see mother. On December 6, 2012, the court terminated mother's parental rights.[10] Mother timely appealed.

---

[10] In November 2012, the Department reported that mother's infant daughter was detained and a petition filed alleging domestic violence between mother and her male companion.

7

*CONTENTIONS*

Mother contends that the court erred in terminating her parental rights because the beneficial parent-child relationship exception applied.

*DISCUSSION*

We review the trial court's ruling that the beneficial parent-child relationship exception did not apply under the substantial evidence test.[11] (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576-577.) "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*Ibid.*)

Section 366.26, subdivision (c)(1)(B) provides that if the juvenile court determines that "it is likely a the child will be adopted, the court *shall* terminate parental rights and order the child placed for adoption" *unless* "[t]he court finds a compelling reason for determining that termination would be detrimental to the child . . . . " Such a reason exists if "[t]he parents have maintained regular visitation and contact with the

---

[11] There is a split of authority concerning the standard of review in this context. The First District Court of Appeal held that the abuse of discretion standard of review applies when evaluating the beneficial parent-child relationship exception. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) In addition, the Sixth District Court of Appeal held that both the substantial evidence test and the abuse of discretion standard of review apply. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [holding that the substantial evidence test applies to the factual issue of whether the beneficial relationship exists, and the abuse of discretion standard of review applies to whether termination of parental rights would be detrimental to the child].) However, most courts have "routinely applied the substantial evidence test to the juvenile court's finding under section 366.26, subdivision (c)(1)(A) [now subdivision (c)(1)(B)(i)]." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351; see also Seiser and Kumli, Cal. Juvenile Courts Practice and Procedure (2012) § 2.171[5][b][i][A] ["This is the better view."])

child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); italics added.)

Under the first requirement of this exception, the parent must show that she maintained regular visitation and contact with the child. Mother argues that she had consistent weekly visits with Ismael during the four and half years after he was removed from maternal grandparents' home. However, mother did not attend "consistent weekly visits" with Ismael throughout his stay in foster care: she often failed to show up for visits and, on at least one occasion, she did not visit Ismael for an entire month. In addition, in order for the beneficial parent-child relationship exception to apply, mother also had to show that she satisfied the second requirement of the exception: that Ismael would benefit from continuing the relationship.

To show that such a beneficial relationship exists, "the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

9

"Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] . . . [¶] The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.)

Mother contends that she shared a significant bond with Ismael. Mother is correct that the evidence shows that Ismael was bonded to her: Ismael often enjoyed seeing mother, and expressed a desire to live with mother on multiple occasions during his long stay in foster care. Ismael was shuttled through four different foster placements before being placed with his current adoptive family, and mother was the only adult with whom he maintained a relationship throughout his entire life. However, that the continuation of mother's relationship with Ismael would confer some benefit to him is not sufficient to show that parental rights should not be terminated. The issue before us is whether the benefit gained by Ismael from the continuation of this parent-child relationship outweighs the well-being he would gain in a permanent home with his adoptive family.

Mother cites to the four variables identified in *In re Autumn H.* to be considered when looking at whether a relationship is beneficial: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576.) Mother argues that the parent-child bond was strong here because Ismael had spent the first two years of his life in mother's custody. However, although Ismael spent two years with mother, he did not live with mother during subsequent four and a half years except for a brief period in 2009 when he was released for a 30-day visit into her care.

Additional evidence establishes that mother's contact with Ismael was not always positive. There was evidence that mother did not appropriately parent Ismael: she was unable to prevent him from biting her and running away from her during unmonitored visits; she upset Ismael by failing to show up for visits or showing up late; she repeatedly took Ismael to see maternal grandfather who had been found to be dangerous to children; she exposed Ismael to activities that were inappropriate for his age when she took him to a tattoo parlor and gave him a violent video game; and she physically abused Ismael by injecting him with a syringe.

Moreover, the record does not indicate that mother and Ismael's interactions were particularly like those of a child with his mother. The Department found that mother's relationship with Ismael was like that of siblings. Moreover, mother's contact with Ismael was almost entirely monitored during his stay in foster care, and she did not have any "day-to-day interaction" in which she attended to his physical needs. The

11

evidence also indicates that mother did not meet Ismael's need for consistency and permanency.  (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)  She repeatedly missed visits and did not complete her court-ordered counseling sessions so that Ismael could be reunified with her.

Furthermore, the psychiatrist who conducted a bonding study of mother, Ismael and his adoptive parents concluded that Ismael's emotional attachment to mother did not outweigh the benefit of adoption.  This constitutes substantial evidence that the benefit Ismael would gain from continuing his relationship with mother did not outweigh "the security and the sense of belonging a new family would confer," and therefore, that the beneficial parent-child relationship exception did not apply here. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

## *DISPOSITION*

The order terminating mother's parental rights is affirmed.

## *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

CROSKEY, Acting P. J.

WE CONCUR:

KITCHING, J.

ALDRICH, J.